In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1637

MARK JENNINGS,

*Plaintiff-Appellant,*

*v.*

STATE OF ILLINOIS DEPARTMENT OF CORRECTIONS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 4087—**Michael M. Mihm**, *Judge.*

ARGUED MAY 25, 2007—DECIDED AUGUST 2, 2007

Before BAUER, CUDAHY, and FLAUM, *Circuit Judges.*

BAUER, *Circuit Judge.* Mark Jennings filed suit against his former employer, the State of Illinois Department of Corrections ("IDOC"), claiming that IDOC had discriminated against him based on his national origin, Mexican-American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* The district court granted summary judgment to IDOC. Jennings filed a timely appeal, and we affirm.

## I. Background

IDOC employed Jennings as a correctional officer at its East Moline Correctional Center ("EMCC") for approxi-

mately 14 years until his discharge in 2002. In February 2002, Jennings came under investigation for smuggling contraband cigars into the EMCC and trading them with prisoners for goods from the prison commissary. Warden Gary Wyant had initiated the investigation after cigars were discovered in the possession of at least one prisoner. Jennings maintained his innocence but an independent investigator, who interviewed eight inmates and Jennings, concluded that Jennings did in fact engage in the prohibited conduct. After receiving the investigator's report, Major Steve Wright recommended a hearing before the EMCC Employee Review Board. In September 2002, the Board recommended a 30-day suspension pending discharge, which Warden Wyant signed on September 3, 2002. The Illinois Department of Central Management Services approved Jennings' discharge in October 2002.

After his discharge, Jennings filed a grievance through his union, claiming that his termination was without cause. An independent arbitrator upheld the termination, concluding that Jennings had engaged in trading and trafficking and that termination was appropriate in light of the seriousness of the misconduct and Jennings' recent disciplinary history.

Jennings filed the present suit after completing the required EEOC administrative process. In this suit, Jennings claims that he was terminated and denied a last-chance settlement agreement, which forced him to submit to arbitration, because of his national origin, Mexican-American.

In response to IDOC's motion for summary judgment, Jennings brought forth a plethora of evidence of discriminatory remarks and comments by Wyant and Wright to and about Jennings and other Hispanic employees at the EMCC around the time of Jennings' termination. Such comments included Wright calling Jennings a "lazy Mexi-

can" shortly before Jennings was investigated for trading and trafficking the cigars; Wright informing Harry Hitchcock, the union representative and correctional officer at the EMCC, that the EMCC "already had enough token Mexicans in managerial positions" when Hitchcock confronted him about Jennings having been turned down repeatedly for additional education and training; Wright informing Hitchcock that he, Wright, would never recommend Jennings for additional training or education because he did not like Jennings; Wyant commenting to Hitchcock that it was his belief that affirmative action was nothing less than reverse discrimination and that what goes around comes around; Wright referring to Lieutenant Tony Gonzales, the only Hispanic-American with a rank above sergeant, as "Token Tony" more than a dozen times; Wyant informing corrections officer Rick Lind that he hated talking to Mexicans on the telephone and that "those 'damn beaners'" should have to pass a test in English to show they can properly write and speak English before they come into the country; and Wyant stating that where he was from in the South "they had different ways of handling those types of people," meaning Mexican-Americans.

Additionally, Jennings brought forth evidence that other non-Mexican-American employees were treated more favorably when caught engaging in prohibited conduct. Mark Koster, Robert Huskey, and Belinda Rusch were found to have engaged in trading and trafficking by bringing their personal electronic equipment to inmates to have the inmates repair the equipment. Koster was given a 30-day suspension pending discharge but later was offered a last-chance agreement that allowed him to enter into a settlement in which he gave up his right to pursue a claim against IDOC in return for a suspension of five days. Huskey was given a 30-day suspension but also entered into a last chance agreement. Rusch was also

given a 30-day suspension pending discharge but did not receive the option of a last-chance agreement. Her case proceeded to arbitration. The arbitrator reduced Rusch's discipline to a 10-day suspension.

The district court granted summary judgment to IDOC, finding that Jennings had failed to offer any proof that any of the actual decision makers had any animus against Mexican-Americans or that the reasons for their decisions were anything but legitimate.

## II. Discussion

We review the district court's grant of summary judgment *de novo,* "viewing all of the facts and drawing all reasonable inferences therefrom in favor of" Jennings, the non-moving party. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

To prove his claim of national origin discrimination, Jennings may use either the direct or indirect method. *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 695 (7th Cir. 2006) (*citing Scaife v. Cook County*, 446 F.3d 735, 739 (7th Cir. 2006)). Jennings seeks to proceed under both methods of proof but succeeds under neither.

Under the direct method, Jennings must prove that IDOC's decisions to terminate his employment and not to offer him a last-chance agreement were motivated by his national origin by offering direct evidence, such as an admission of discrimination, or sufficient circumstantial

evidence that points directly to a discriminatory reason for the termination decision. *Id.* (citations omitted). For purposes of the direct method of proof, "[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class." *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) (*quoting Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

Under the now familiar indirect method of proof, first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), Jennings may establish his claim of national origin discrimination by first proving a *prima facie* case that (1) he is a member of a protected class, (2) he performed his job to IDOC's legitimate expectations, (3) despite his satisfactory performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably than he. *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006). Once Jennings proves a *prima facie* case of discrimination, the burden shifts to IDOC to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If IDOC succeeds in rebutting Jennings' *prima facie* case with a legitimate, nondiscriminatory reason for its decision to terminate Jennings, the burden shifts back to Jennings to prove that the stated reason for the termination decision is pretextual. *Id.*

Jennings' claim of discrimination fails because there was no showing of a causal connection between the discriminatory conduct of Wyant and Wright and Jennings' termina-

tion without the offer of a last-chance agreement.[1] Jennings points to Wyant's and Wright's comments denigrating Mexican-Americans and Jennings, in particular, accompanied by more favorable treatment for other non-Hispanic employees, as direct evidence establishing a discriminatory basis for his discharge. However, the independent investigator and independent arbitrator both concluded that Jennings had engaged in trading and trafficking, which broke any connection between Wyant's and Wright's improper motivations and the ultimate outcome, absolving IDOC of liability. *See Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and legally permissible basis, the bias of the subordinate is not relevant."). *See also Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 920 (7th Cir. 2007) (recognizing line of cases holding that "even where a biased employee may have leveled false charges of misconduct against the plaintiff, the employer does

---

[1] The district court recognized that the failure to offer Jennings a last-chance agreement was not the same as the decision to terminate Jennings because it did not conclusively resolve the question of whether IDOC would continue to employ Jennings. The actual issue, instead, was whether forcing someone to subject himself to arbitration where he faces the possibility of losing his position is an adverse employment action. The district court concluded that this constituted an adverse employment action. Because Jennings failed to establish a causal connection between the discriminatory conduct and the ultimate outcome in this case, however, we need not decide whether the failure to offer Jennings a last-chance agreement or whether forcing someone to subject himself to arbitration that may result in termination constitutes an adverse employment action.

not face Title VII liability so long as the decision maker independently investigates the claims before acting").

Wyant and Wright did not terminate Jennings or decide against offering Jennings a last-chance agreement; instead, the EMCC Employee Review Board recommended a thirty-day suspension pending discharge, and the Department of Central Management Services decided to terminate Jennings' employment without offering a last-chance agreement. Wyant and Wright participated in various aspects of the termination process: Wyant initiated the investigation and signed off on the recommendation of the Employee Review Board; Wright referred the matter to the Employee Review Board after receiving the report of the independent investigator. But Jennings has not offered any evidence or even suggested that Wyant or Wright had any influence over the independent investigator, the Employee Review Board, the Department of Central Management Services, or the independent arbitrator, much less the singular degree of influence necessary for a finding that Wyant and Wright were functionally responsible for Jennings' termination without the offer of a last-chance agreement. *See Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 612-13 (7th Cir. 2005) (upholding summary judgment where an allegedly biased employee was on a seven-member committee that recommended the plaintiff's termination). Nor has Jennings offered evidence that the independent investigation and independent arbitration, in which he was offered the opportunity to present his side of the story, were shams or conduits for Wyant's and Wright's discriminatory animus. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (holding that if review committee that was ignorant of district manager's age-based discriminatory animus acted "as the conduit of [manager's] prejudice—his cat's paw—the innocence of its members would not spare the company from liability").

Additionally, even assuming that Jennings stated a *prima facie* case of discrimination under the indirect method of proof, he failed to offer evidence rebutting IDOC's legitimate explanation for its decisions to terminate Jennings and not to offer him a last-chance agreement; *i.e.,* an independent investigator and independent arbitrator separately reached the conclusion that Jennings had engaged in the prohibited conduct of trading and trafficking. And there was no evidence that the independent investigator, the EMCC Employee Review Board, the independent arbitrator, or the Department of Central Management Services bore any discriminatory animus toward Mexican-Americans, or Jennings in particular. A reasonable jury could not find that IDOC intentionally discriminated against Jennings by firing him. The district court therefore properly granted summary judgment to IDOC.

## III.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

CUDAHY, *Circuit Judge*, concurring.  This case presents the anomaly of a prison manager (the warden) without the ultimate power of management: the power to discharge employees. Perhaps this apparent anomaly is merely a by-product of the circumstances of litigation—a failure of proof on Jennings' part—and the authority exercised by the Department of Central Management Services is essentially a "liability shield," despite whose obscuring

effect the warden's influence is in fact decisive. *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). But on this record it really seems that Illinois has bifurcated the management of the personnel in its Department of Corrections in the interest of insulating the exercise of certain management prerogatives against the influence of improper motives.

I must agree with my colleagues that Jennings has not offered any evidence that Wyant had sufficient influence over the decision of the Department of Central Management Services (the ostensible decision-maker) to make Wyant's motives decisive or even relevant; the suggestion that he controlled the outcome "rests on surmise." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1401 (7th Cir. 1997). How the warden's lack of influence can be reconciled in the real world with the need for efficient prison administration is a bit mysterious, but it is not our task for present purposes to unravel that mystery.

A true Copy:

      Teste:

 

                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*