**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 27, 2016
Decided June 28, 2016

**Before**

JOEL M. FLAUM, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 15-2701

| | |
|---|---|
| YOUSEF ISMAIL, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Northern District of Illinois, |
| | Eastern Division. |
|     *v.* | |
| | No. 11-cv-08812 |
| MEGAN J. BRENNAN, | |
| Postmaster General | James B. Zagel, |
|     *Defendant-Appellee*. | *Judge*. |

### O R D E R

Yousef Ismail, who is of "Middle Eastern descent," appeals the grant of summary judgment for his employer the United States Postal Service in this suit asserting claims under 42 U.S.C. §§ 2000e–2, 2000e–3 for disciplining him because of his race and national origin. Because the district court incorrectly concluded that Ismail had failed to establish a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), we vacate the district court's order and remand the case for further proceedings.

Ismail, who was born in Israel and grew up in Jordan, started working as a letter carrier in the Carpentersville Post Office in 2001. He filed the first of his two suits against the Post Office in 2003, alleging that the postmaster of the Carpentersville Post Office, Ralph Kaiser, harassed and disciplined him because of his race and national origin. That suit ended with summary judgment being granted against him. *See Ismail v. Potter*, 2006 WL 2989293 (N.D. Ill. Oct. 18, 2006).

The events that give rise to Ismail's second discrimination suit occurred on the snowy morning of December 10, 2010, when he was sorting the mail for his route. We repeat the facts in the light most favorable to Ismail, the party opposing summary judgment. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 377 (7th Cir. 2000). That day he was approached by his direct supervisor, Dawn Ellison, who asked if the snow would make him late delivering his mail. Ismail replied that he did not know. Anticipating a possible problem, Ellison alerted Postmaster Kaiser, who in turn approached Ismail in his casing unit (the area of the post office where the letter carriers sort the mail for their routes). Kaiser asked Ismail why he would be late given that less than an inch of snow had fallen that morning. Ismail responded that he didn't anticipate being late but that if Kaiser wanted to observe him delivering his route he was welcome to do so.

Shortly after Ismail began delivering his route, he noticed Kaiser sitting in his personal SUV watching him. Ismail ordinarily cut across the lawns of the homes on his route, but bushes blocked his path for the next stop, so he turned towards the sidewalk. Kaiser yelled out that the sidewalk had a foot of snow and ice debris and that cutting across the lawn would be the shortest path between the houses. When Ismail continued toward the sidewalk, Kaiser ordered him to walk instead on the street where there was no snow. Ismail believed that walking in the street was dangerous, so he took a couple of steps on the sidewalk to get around the bushes, stepped onto the lawn, and headed toward the house.

Kaiser then got out of his vehicle, approached Ismail, and began screaming at Ismail that he was not following orders and would be disciplined. Ismail, fearing for his safety, pulled out his cell phone and called the police. A police officer later arrived, asked a few questions, and brushed off the incident as a routine workplace dispute.

Upon returning to the post office, Kaiser contacted the Post Office's labor relations department and explained that Ismail had disobeyed his orders when he continued to walk on snow and ice debris on the sidewalk. According to Kaiser, labor

relations told him to have a second supervisor return with him to observe Ismail. Kaiser enlisted Ellison to return with him to follow Ismail.

Kaiser and Ellison located Ismail on his route and watched him delivering mail to several houses. According to Ismail, he continued to deliver mail by cutting across the lawns of each home, except for two residences that had asked letter carriers not to walk on their lawns. When Ismail finished that street's deliveries, he was approached by Ellison and Kaiser, who admonished him for failing to cut across lawns as instructed and for running late on his route. Ismail responded that he was doing the best he could and that he was on time for his route. Kaiser told Ismail to stop delivering mail and return to the post office.

Kaiser followed Ismail back to the post office, where he took Ismail's keys and sent him home on "emergency placement" for failing to follow orders and for performing his duties in an unsafe manner. Ismail was on emergency placement for 17 days. During this time he was not allowed to work and he was not paid. When Ismail eventually returned, Kaiser issued him a two-week, paid suspension. Ismail received back pay for the majority of the 17 days that he served on emergency placement.

Ismail filed an EEO complaint alleging that Kaiser had discriminated against him based on his race and national origin. In December 2011, Ismail brought this suit alleging that Kaiser disciplined him more harshly than other postal service employees because of his race and national origin.

Ismail's difficulties at work continued. Three months later, in March 2012, he had a verbal altercation with a coworker that resulted in both men being fired (though they were later reinstated). According to Ismail, David Sherrill, a fellow letter carrier, approached him one morning, cursed at him, and told him that he would "snap his neck." Ismail alerted his supervisor, Dennis Arneson, who had both men write out statements about what had happened. Kaiser then put both men on emergency placement and issued letters of removal. Ismail and Sherrill both grieved their terminations and were eventually reinstated, though Sherrill's grievance was resolved faster than Ismail's, and he returned to work seven weeks earlier. Kaiser was not involved in the grievance resolution process.

In June 2012 Ismail filed another EEO complaint about Kaiser's conduct, alleging that Kaiser sent him a letter of removal in retaliation for his filing a lawsuit.

In July, on Ismail's first day back to work upon being reinstated, he had a confrontation with Kaiser that resulted in his being sent home for the day. Ismail was sorting mail for the day's delivery in his casing unit when Kaiser and Arneson approached him with a workplace rules handbook. Three times, Kaiser says, he said "good morning" to Ismail while walking by his casing unit, and Ismail ignored him. Kaiser told Ismail to read the section of the manual relating to courteousness in the workplace and asked him if he understood what it meant. Ismail replied that he did. According to Kaiser, Ismail then threatened to kill him. Kaiser left Ismail's casing unit and called the police. Arneson, who was standing nearby, did not hear any threat. An officer arrived and interviewed the three of them but concluded that Kaiser's uncorroborated account was insufficient to arrest Ismail. Kaiser put Ismail on administrative leave for the rest of the day, and the officer escorted Ismail from the building.

Ismail amended his EEO complaint to include these incidents and, in December 2012, amended his complaint to add retaliation claims against Kaiser for the March and July incidents.

The district court granted the Postal Service's motion for summary judgment. Regarding Ismail's claim of discrimination, the court concluded that he failed to establish a prima facie case through the indirect method of proof. Ismail was not meeting his employer's legitimate business expectations, the court said, because he disobeyed Kaiser's directive in December 2010 to walk on the street in order to avoid snow that had accumulated on the sidewalks of his route. Moreover, Ismail had not identified any similarly situated comparators who were treated more favorably.

On appeal Ismail first challenges the district court's conclusion that he failed to establish a prima facie case of discrimination. The court, he says, should not have relied on Kaiser's disputed testimony of his insubordination as the basis for concluding that he was not meeting his employer's legitimate expectations. He adds that he should not have to show that he was meeting legitimate expectations because Kaiser is both the decision-maker and the person evaluating his performance.

The district court erred in requiring Ismail to establish that he was meeting his employer's legitimate expectations. Ordinarily, that factor must be established by a plaintiff seeking to state a prima facie case of discrimination, *see McDonnell Douglas Corp.*, 411 U.S. at 802; *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885–86 (7th Cir. 2001).

But the test is flexible and may be unnecessary where, as here, "the issue is whether the plaintiff was singled out for discipline based on a prohibited factor," *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (quotation and internal citation omitted), or where "the people judging [the plaintiff's] performance were the same she accused of discriminating against her," *Oest v. Ill. Dept. Corr.*, 240 F.3d 605, 612 n.3 (7th Cir. 2001).

Ismail next challenges the district court's determination that he had not identified a similarly situated employee who received better treatment. He points to two individuals—not of Middle Eastern descent—who he believed were similarly situated employees yet were treated more favorably. First, he identified Don Daley, a letter carrier who had crashed his mail truck into a forklift and then left the scene of the accident without notifying his supervisor or cleaning up the broken glass on the roadway. Daley was not put on emergency placement but issued merely a 14-day suspension for "failure to perform your duties in a safe manner" and "failure to report an accident." The district court acknowledged that Daley violated the same standard of conduct as Ismail—not performing his duties in a safe manner—but found Daley's violation less severe because he admitted to having crashed his truck and failed to report it, whereas Ismail threatened workplace safety by refusing to accept responsibility for his conduct. But to establish an inferential case of discrimination, Ismail had to show only that Daley violated the same rules by engaging in an act of comparable seriousness but received better treatment. *See Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012); *Peirick v. IUPUI Athletics Dept.*, 510 F.3d 681, 689 (7th Cir. 2007); *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005). And a reasonable jury could conclude that Daley's conduct, even if acknowledged, was far more dangerous—crashing his truck and leaving debris at the scene—than Ismail's walking on top of snow. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 704–05 (7th Cir. 2013) (jury must decide whether factual differences between extent and seriousness of two inventory control infractions supported employer's differing discipline); *Coleman*, 667 F.3d at 851 ("[T]he employer cannot defeat a plaintiff's prima facie case of discrimination on the theory that it applied its 'no tolerance' policy on threats to some workers while dismissing dangerous acts of others as mere 'horseplay.'"); *Srail v. Vill. of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009) (similarly situated comparator does not have to be identical in every respect and whether an employee is similarly situated is "usually a question for the fact-finder").

Ismail also challenges the court's conclusion that a second comparator, Dana Hall, was not similarly situated because she was treated more harshly by being fired for her conduct. Hall, a window clerk, twice had reported to work acting erratically, as if she were intoxicated. The first time, Ellison watched Hall being rude to customers, slur

her speech, make wild gestures with her arms, and nearly fall over; Ellison sent her home for the day but chose not to issue any discipline, a decision seconded by Kaiser. Less than three months later, Hall arrived at work smelling of alcohol, disregarded Kaiser's instructions to secure a ride home, and drove her car out of the parking lot; Kaiser again declined to discipline her, though he did call the police to inform them that Hall might be intoxicated and was driving. Significantly, however, Hall was fired for unrelated "attendance issues," not these two incidents involving intoxication. After the incidents she merely was referred, with Kaiser's approval, to the employee assistance program and allowed to continue working. A reasonable jury could conclude that Hall was treated more favorably than Ismail because, unlike his immediate emergency placement and suspension, she was allowed to rectify her misconduct before facing any punishment. Moreover, the district court erred by characterizing Hall's conduct as potentially not of comparable seriousness; the Postal Service admits that showing up to work intoxicated poses a safety risk, and that Hall disobeyed Kaiser's direct order not to drive home.

Because we believe that Ismail has established a prima facie case of discrimination, he still bears the burden of showing that the Postal Service's legitimate, nondiscriminatory reason for disciplining him—that he posed a safety risk and failed to follow a direct order from his supervisor—is pretextual. *See McDonnell Douglas Corp.*, 411 U.S. at 802–03; *Chaib v. Geo Grp., Inc.*, No. 15-1614, 2016 WL 1375869, at *3 (7th Cir. Apr. 6, 2016). This is an issue that the district court did not reach.

But we also believe that Ismail has presented enough evidence to create a fact question concerning pretext. Establishing pretext requires Ismail to show that the employer's stated reason for disciplining him was "a lie," *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010) (quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005)). As discussed above, Ismail provided evidence that Daley and Hall were situated similarly to him but treated more leniently. Because this evidence permits an inference that the defendant selectively enforced its policies on workplace safety and disobedience of supervisor orders, a fact question exists over the Postal Service's stated reason for disciplining him. *See Coleman*, 667 F.3d at 857 ("[S]elective enforcement of a rule calls into question the veracity of the employer's explanation."); *Curry*, 270 F.3d at 479; *Gordon*, 246 F.3d at 892; *Russell v. Bd. of Tr. of Univ. of Ill. at Chi.*, 243 F.3d 336, 342 (7th Cir. 2001).

What is more, Ismail has provided sufficient contextual evidence that a reasonable jury could find the Postal Service's explanation for his discipline "fishy

enough to support an inference that the real reason" was discriminatory. *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011); *Coleman*, 667 F.3d at 854–55. First, Kaiser testified in his deposition that he typically did not discipline employees and left such decisions to the discretion of the direct supervisors. Second, he didn't normally observe letter carriers on their routes and this was the only time he ever instructed a mail carrier where to walk while delivering mail. Finally, when Kaiser put Ismail on emergency placement, it was only the second time he had ever put an employee on emergency placement in more than 20 years as postmaster at Carpentersville despite knowing that other employees had violated safety rules or disobeyed orders.

One issue remains. Ismail also argues that the district court erred when it granted summary judgment against him on his retaliation claim because he did not provide evidence of a causal connection between a protected activity and an adverse employment action. But Ismail did provide such evidence by amassing a convincing mosaic of circumstantial evidence that would permit a reasonable juror to infer that his filing of various EEO complaints and this lawsuit resulted in adverse actions. *See Coleman*, 667 F.3d at 860; *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). Ismail provided evidence of suspicious timing: he pointed out that he was put on emergency placement and issued a letter of removal three months after filing this lawsuit, and he was accused of threatening Kaiser and sent home for the day only a few weeks after filing an EEO complaint. *See Coleman*, 667 F.3d at 861 ("[A]n interval of a few weeks or even months may provide probative evidence of the required causal nexus.") Although "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter," *O'Leary v. Accretive Health Inc.*, 657 F.3d 625, 635 (7th Cir. 2011); *see Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013), Ismail also has provided evidence of pretext. He has introduced evidence that supports an inference that Kaiser lied when he stated that Ismail's threat was the reason he called the police in July and had Ismail put on administrative leave. Ismail denies making any threat; Arneson, who was nearby, did not overhear any threat; and the police were unable to verify that a threat had been made.

Accordingly, we VACATE the district court's judgment, and REMAND for further proceedings.